CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA
FILED
11/19/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JAMIE RAY LONG,

Plaintiff,

v.

PULASKI COUNTY PUBLIC SERVICE AUTHORITY,

Defendant.

Civil Action No. 7:25-cv-00484

**MEMORANDUM OPINION**

By: Hon. Thomas T. Cullen
United States District Judge

---

Plaintiff Jamie Ray Long brought this action against his former employer, Defendant Pulaski County Public Service Authority ("PSA" or "Authority"), for alleged violations of the Americans with Disabilities Act ("ADA"). Long asserts claims of disability discrimination and retaliation stemming from the termination of his employment. (*See generally* Am. Compl. [ECF No. 4].)

The matter is before the court on the PSA's Motion for Summary Judgment. (ECF No. 31.) Because genuine disputes of material fact exist as to both ADA claims, the court will deny the motion.

## I. Statement of Facts and Procedural Background

The following facts are either undisputed or presented in the light most favorable to Long, the nonmoving party on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). They are primarily taken from the deposition transcripts submitted with the PSA's motion.

On or about January 9, 2023, the PSA hired Long to work as a Water Service Technician in its Water and Wastewater Department. (Am. Compl. ¶ 10.) In that position, Long was a member of a maintenance crew supervised by Richard Fasnacht. (Fasnacht Dep. at 4:18–23 [ECF No. 32-4].) His job duties generally involved the repair and maintenance of Pulaski County's water and sewer system. (Long Dep. at 16:19–17:2 [ECF No. 32-1]; Fasnacht Dep. at 4:21–25.)

In March 2023, the topic of mowing grass came up while Long was working with other members of the maintenance crew. (Long Dep. at 54:20–55:6.) One of Long's coworkers complained about the crew needing to begin mowing soon. (*Id.*) Long responded that he recalled Fasnacht telling him during his interview that his job would involve only occasional mowing. (*See id.* at 55:2–3 ("And I was like—and I remember [Fasnacht] saying in the interview we mow some . . . . [B]ut he didn't say the way you're saying it, that we mow all the time.").) When Fasnacht subsequently joined the group, one of the crew members immediately reported that Long claimed to have been told by Fasnacht that the crew "didn't mow," and another crew member accused Long of calling Fasnacht a "liar." (*Id.* at 55:14–22.) Long denied—and continues to deny—having used that term to describe Fasnacht (*id.* at 55:23–24, 100:3–5), and he maintains that "any disagreement was minor and part of ordinary workplace interactions." (Pl.'s Answer to Def.'s Interrog. No. 6 [ECF No. 32-3].)

On Friday, March 31, 2023, Long and other employees began servicing lawn equipment used to mow around water tanks. (Long Dep. at 23:8–19.) The equipment included a Gravely commercial mower that required maintenance. (*Id.* at 23:20–22.) Fasnacht instructed Long and another employee to lift the mower and set it on blocks so that they could inspect underneath

the mower. (*Id.* at 23:22–24:5.) When Long expressed concern about lifting the mower because of a prior back injury, Fasnacht insisted that Long would "be all right." (*Id.* at 24:6–11.) Long ultimately complied with Fasnacht's instructions, and he experienced significant back pain during the lifting process. (*Id.* at 24:9–24.) Long reported the pain to Fasnacht, and Fasnacht informed him that he needed to be more careful when lifting heavy items. (*Id.* at 24:14–18.)

The following Monday, April 3, 2023, Long went to Fasnacht's office and informed him that his back pain had worsened over the weekend. (*Id.* at 25:11–16.) Long explained that he had originally injured his back while working for a concrete company and that he planned to make an appointment with Dr. Jody Helms, the same doctor who previously treated him in connection with a workers' compensation claim. (*Id.* at 24:14–16, 25:20–25; *see also* Fasnacht Dep. at 11:25–12:4.) Long also informed Fasnacht that he was "not a hundred percent" and requested that Fasnacht "bear with [him]" until he could obtain medical treatment. (Long Dep. at 40:21–23.) According to Fasnacht, Long specifically inquired about "light duty" work, and Fasnacht responded that "Human Resources and the doctor [would have to] put [Long] on light duty." (Fasnacht Dep. at 12:11–14 (internal quotation marks omitted); *see also id.* at 13:1–3 ("He said he was going to the doctor and I said the doctor would have to communicate with HR back and forth. I can't put somebody on light duty.").)

On or around that same day, Fasnacht spoke to Jared Linkous, the Executive Director of the PSA, and informed Linkous that Long had injured his back at work and that they had discussed whether Long could continue performing the essential functions of his job. (Linkous Dep. at 24:7–25:19 [ECF No. 32-5].) Fasnacht also informed Linkous that he wanted to terminate Long's employment. (Fasnacht Dep. at 24:6–17; Linkous Dep. at 18:5–16.)

According to Linkous, Fasnacht reported that Long had accused him of lying about the mowing responsibilities associated with Long's position. (Linkous Dep. at 18:2–5.) Fasnacht also advised Linkous that Long was "continuing to be disruptive," that "he couldn't pair [Long] with the other guys," and that "he was having issues working with [Long] himself." (*Id.* at 18:6–8.)

On or about Tuesday, April 4, 2023, Fasnacht asked Long several questions regarding his back injury. (Long Dep. at 49:6–11, 84:3–9.) Fasnacht informed Long that Linkous "[w]anted all the information he could get about it." (*Id.* at 84:8–9.) Fasnacht also told Long that Fasnacht would "hate to lose" him since he was "such a good employee," but that he could not be "a liability to the county." (*Id.* at 84:10–14.)

That same day, Fasnacht contacted Human Resources Director Tammy Nichols and reported that some of his employees "were upset regarding the working conditions involving Mr. Long and that there had been some disagreements regarding [Long's] mowing duties" and other "work assignments." (Nichols Dep. at 11:22–12:3 [ECF No 32-6].) Fasnacht also reported that Long had become increasingly argumentative with him regarding the mowing duties, to the point that Fasnacht "felt like he was being harassed on a daily basis" and that Long "was becoming insubordinate with him." (*Id.* at 12:4–8.) By that point, Fasnacht had already suggested to Linkous that the PSA "separate employment" with Long. (*Id.* at 12:20.) Based on the information provided by Fasnacht, Nichols and Linkous "agreed to do that." (*Id.* at 12:21.) Fasnacht and Linkous subsequently called Long into the office on Thursday, April 6, 2023, and fired him. (Long Dep. at 63:20–64:1.)

Fasnacht testified at his deposition that the termination decision was based on Long's harassing behavior or insubordination. (Fasnacht Dep. at 17:19–18:2.) Fasnacht acknowledged, however, that Long received no written warnings or negative evaluations concerning his job performance or behavior prior to his termination. (*Id.* at 18:22–25; *see also* Nichols Dep. at 21:13–15 (confirming that Long had no previous warnings or reprimands in his personnel file).) Fasnacht also acknowledged that Long had done "everything [Fasnacht] asked him to do." (Fasnacht Dep. at 18:25.)

When Fasnacht reported Long's alleged harassment and insubordination to Nichols, Fasnacht failed to inform her of Long's recent back injury, his intention to seek medical attention, or their discussion regarding "light duty" work. (*Id.* at 13:1–7, 16:9–11; 17:15–18; *see also* Nichols Dep. at 13:1–4, 20:3–9.) Likewise, Linkous "never reported" Long's injury to Nichols. (*Id.* at 20:3–9.) Nichols did not become aware of Long's complaints of back pain or any requested accommodation until after Long was terminated. (Nichols Dep. at 15:7–12; *see also id.* at 34:24–35:1 ("I was not aware until after the termination had taken place that Mr. Long even had a disability or was claiming a disability or had requested light duty.").) Nichols acknowledged at her deposition that the decision to terminate Long's employment may have been different had she known about Long's back issues and possible need for an accommodation:

> Q. [H]ad you known . . . about this, that would have altered just a straight termination, correct?
>
> A. Potentially, yes, because then I would have beg[un] an interactive process with Mr. Long.
>
> . . . .

> Q. And would the Authority's decision to straight terminate him have been different[] knowing the information it has now today?
>
> A. It could have been. Yes.
>
> Q. And what could have been the different decisions that could have been made?
>
> . . . .
>
> A. I would have started an interaction between Mr. Long and myself as far as an interactive process for an accommodation.

(Nichols Dep. at 20:14–17, 33:11–21.)

Following his termination, Long spoke to Assistant County Administrator Anthony Akers regarding the decision. (*Id.* at 15:14–16.) Long told Akers that he had been asked specific questions regarding his back injury prior to being terminated. (*Id.* at 15:22–23.) Akers advised Long that he would need to speak with Human Resources. (*Id.* at 15:14–17.) Long then contacted Nichols and informed her of his back injury and the injury-related questions asked by Fasnacht. (*Id.* at 15:17–21; Long Dep. at 27:25–28:9.) Although Long's allegations prompted an investigation by Human Resources, the PSA ultimately declined to reinstate Long. (Nichols Dep. at 15:22–16:13, 35:2–37:13.)

Long subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the PSA discriminated against him on the basis of disability and discharged him in retaliation for engaging in activity protected by the ADA. (*See* Compl. Ex. 1 [ECF No. 1-1].) After receiving a right-to-sue letter from the EEOC, Long filed this action on July 21, 2025. (ECF No. 1; Am. Compl. Ex. 1 [ECF No. 4-1].) The case is presently before the court on the PSA's Motion for Summary Judgment. (ECF No. 31.)

## II. STANDARD OF REVIEW

Under Rule 56(a), the court can only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If it meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213. Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To grant summary judgment, "the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

## III. ANALYSIS

### A. Disability Discrimination

Title I of the ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Disability discrimination may be proven through direct and indirect evidence or through the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015). In this case, the parties have confined their arguments to the *McDonnell Douglas* framework. (*See generally* Def.'s Br. Supp. Mot. Summ. J. [ECF No. 32]; Pl.'s Br. Opp'n Mot. Summ. J. [ECF No. 33].) Accordingly, the court will utilize this framework to determine whether summary judgment is appropriate.

Under this framework, a plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff's initial burden is "not onerous." *Texas Dep't of Cmty. Affrs. v. Burdine*, 450 U.S. 248, 253 (1981). To establish a prima

facie case of disability discrimination under the ADA, a plaintiff must prove (1) that he has a disability, (2) that he is a "qualified individual for the employment in question," and (3) that his employer discharged him or took some other adverse employment action "because of [his] disability." *Jacobs*, 780 F.3d at 572 (internal quotation marks omitted).

If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 575. If the employer makes this showing, "the burden then shifts back to the plaintiff to show that the employer's explanation was 'actually a pretext for discrimination.'" *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (quoting *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)).

**1. Prima Facie Case of Discrimination**

For purposes of the pending motion, the PSA only challenges the sufficiency of the evidence with respect to the first element of a prima facie case, arguing that Long is unable to establish that he was disabled at the time of his termination. (Def.'s Br. Supp. Mot. Summ. J. at 4; *see also* Def.'s Reply Br. at 3–6 [ECF No. 36].) The ADA provides three avenues for establishing the existence of a "disability." 42 U.S.C. § 12102(1). The term is defined to include: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.*

In 2008, Congress enacted the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat 3553, which "broadened the definition of 'disability.'" *Summers v. Altarum 14 Inst. Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). The principal purpose of the ADAAA was "to make

it 'easier for people with disabilities to obtain protection under the ADA.'" *Jacobs*, 780 F.3d at 572 (quoting 29 C.F.R. § 1630.1(c)(4)). Based on the amendments, the issue of whether a person is disabled under the ADA "should not demand extensive analysis." *Jacobs*, 780 F.3d at 572 (quoting Pub. L. No. 110-325, § 2(b)(5) (2008)).

In response to the PSA's Motion for Summary Judgment, Long contends that a reasonable jury could find that the PSA regarded him as disabled within the meaning of 42 U.S.C. § 12102(1)(C). The ADAAA "expanded the scope of the ADA's 'regarded-as' definition of disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 430 (9th Cir. 2018). An individual now "meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added).[1]

Viewing the evidence in the light most favorable to Long, the court concludes that a genuine dispute of material fact exists as to whether Long was "regarded as" having a disability. According to Long's deposition testimony, everything at work was "great" until he aggravated a preexisting back injury while lifting a mower and immediately disclosed the condition to Fasnacht. (Long Dep. at 17:25–18:14.) A few days later, Fasnacht told Long that Linkous wanted additional information regarding the back injury and that Long could not be "a liability

[1] In the reply brief filed in support of its Motion for Summary Judgment, the PSA continues to rely on pre-ADAAA authority to suggest that Long is required to show that the PSA believed that his impairment substantially limited his ability to perform a major life activity. (*See, e.g.*, Def.'s Reply Br. at 6 (citing *Williams v. Fed. Express Corp.*, No. 3:97-cv-00433, 1999 WL 1940039 (W.D.N.C. May 18, 1999)).) "Based on the plain language of the ADAAA," however, it would be "error" to require Long to present such evidence. *Nunies*, 908 F.3d at 434; *see also Oates v. Florence Sch. Dist. One*, No. 4:24-cv-00384, 2026 WL 2409711, at *3 (D.S.C. Aug. 18, 2026) ("[T]o the extent the District relies on [the] pre-ADAAA regarded-as standard, under which an employer had to perceive an impairment as substantially limiting a major life activity, that standard no longer defines regarded-as disability under the amended ADA.").

to the county." (*Id.* at 84:8–14.) And less than a week after Long reinjured his back at work, Fasnacht and Linkous advised him that he was being fired. (*Id.* at 63:20–64:1.) On this record, a reasonable jury could find that the PSA terminated Long "because of" his back injury and therefore regarded him as disabled. 42 U.S.C. § 12102(3)(A).

The PSA has not specifically challenged Long's ability to establish the second and third elements of a prima facie case of disability discrimination. In any event, the court concludes that a reasonable jury could find that Long was qualified for his job (the second element) and that the PSA terminated him because of his disability (the third element). *Jacobs*, 780 F.3d at 572. With respect to the second element, Fasnacht acknowledged at his deposition that Long "perform[ed] his duties as assigned" (Fasnacht Dep. at 19:3–6), and it is undisputed that Long received no written reprimands or negative performance evaluations prior to his termination. *See Jacobs*, 780 F.3d at 575 (noting that the "total lack of documentary evidence of Jacobs's alleged poor performance" supported a finding that Jacobs was qualified for her position). With respect to the third element, the record reflects that the PSA terminated Long six days after he reinjured his back at work and that Fasnacht and Linkous discussed Long's back issues prior to firing him. "It is well-established that 'close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation.'" *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (quoting *Jacobs*, 780 F.3d at 575).

For these reasons, the court concludes that Long has presented sufficient evidence to establish a prima facie case of disability discrimination.

### 2. Pretext

Under the *McDonnell Douglas* framework, the burden shifts to the PSA to produce evidence of a legitimate, non-discriminatory reason for terminating Long. *Jacobs*, 780 F.3d at 575 (citing *McDonnell Douglas*, 411 U.S. at 802). The PSA has presented deposition testimony indicating that Long was terminated for behavioral issues that affected his ability to get along with coworkers and bordered on insubordination and harassment. (*See* Fasnacht Dep. at 15:9–21, 16:21–24; Linkous Dep. at 14:17–22, 17:22–18:16; Nichols Dep. at 11:12–12:21.) For purposes of the pending motion, the court concludes that the PSA has satisfied its "relatively modest burden." *Jacobs*, 780 F.3d at 575; *see also Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (noting that the employer's burden is "one of production, not persuasion" and involves "no credibility assessment" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

The burden therefore shifts back to Long to present evidence sufficient to establish that the PSA's alleged reasons for firing him were not its true reasons, but rather a pretext for discrimination. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025). The types of evidence that may be used to demonstrate pretext include evidence that an employer's justifications for an adverse employment decision were "inconsistent over time, false, or based on mistakes of fact," *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019), and evidence "demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation," *Jacobs*, 780 F.3d at 576. A plaintiff may also demonstrate pretext "by offering circumstantial evidence of discrimination . . . in the form of conduct or circumstances probative of discriminatory animus." *Wannamaker-Amos*, 126

F.4th at 259. Although temporal proximity alone is generally insufficient to defeat summary judgment at the pretext stage, *S.B. ex rel. A.L. v. Bd. Educ. of Harford Cnty.*, 819 F.3d 69, 79 (4th Cir. 2016), "the combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment," *Burton v. Freescale Semiconducting, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015). *See also Pannek v. U.S. Bank N.A.*, 186 F.4th 382, 394 (6th Cir. 2026) ("Coupled with other evidence, 'such temporal proximity can be used as indirect evidence to support an employee's claim of pretext.'" (quoting *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 256 (6th Cir. 2023)).

Viewing the record in the light most favorable to Long, the court concludes that a reasonable jury could find that the asserted justifications for his termination are pretextual. Although the PSA now contends that Long created a "toxic" work environment and was "insufferable to work with" from the very beginning of his employment (Def.'s Br. Supp. Mot. Summ. J. at 1–2), it is undisputed that Long received no written warnings or negative performance evaluations prior to his termination. To the contrary, Fasnacht acknowledged during his deposition that Long "did everything [Fasnacht] asked him to do." (Fasnacht Dep. at 18:25.) Additionally, only a few days before Long's termination, Fasnacht allegedly told Long that he was "such a good employee." (Long Dep. at 84:11.) Drawing all reasonable inferences in Long's favor, a reasonable jury could find the absence of any contemporaneous documentation of his purportedly ongoing behavior issues to be indicative of pretext. *See Jacobs*, 780 F.3d at 576 (concluding that "undocumented and uncorroborated justifications [were] pretextual and were not the actual reason for Jacobs's termination"); *see also Burton*, 798

F.3d at 240 (finding that the lack of documentation mattered because the defendants claimed that the plaintiff had a history of performance issues).

A reasonable jury could also find the timeline of events to be probative of pretext. As indicated above, the PSA terminated Long's employment less than a week after he reinjured his back and discussed the possibility of light-duty work with Fasnacht. And two days prior to his termination, Fasnacht asked Long questions regarding his back injury and told him that Linkous had requested additional information. Fasnacht also purportedly said that he would "hate to lose" Long but that Long could not be "a liability to the county." (Long Dep. at 84:10–14.) Fasnacht's alleged comments, coupled with the suspicious timing of Long's termination, further support a reasonable finding of pretext.

In its reply brief, the PSA argues that Linkous was the "ultimate decision maker" and that Linkous "had no notice of any alleged back injury." (Def.'s Reply Br. at 5.) This argument, however, conflicts with Linkous's own deposition testimony. Although Linkous did not recall the injury resulting from lifting a mower, he testified that he knew that Long had injured his back at work and that Long and Fasnacht had discussed whether Long "could continue performing essential functions or [would] need to speak to HR about light duty." (Linkous Dep. at 24:7–25:16.) Therefore, as Nichols also acknowledged at her deposition, "Mr. Linkous knew that Mr. Long injured his back prior to termination" or, at the very least, "aggravated his preexisting injury." (Nichols Dep. at 20:3–7.)

Finally, it is undisputed that neither Fasnacht nor Linkous mentioned Long's back injury to Nichols when they spoke to her about terminating his employment. While Nichols could not say that they "knowingly concealed it," she confirmed during her deposition that

"[t]hey did not share that information" with her. (Nichols Dep. at 20:12–13.) She also testified that if she had known about Long's back injury, she would have initiated an interactive process with Long, rather than proceeding directly to termination.[2] (*Id.* at 20:14–17.)

Based on all of this evidence, a reasonable jury could find that the PSA's alleged reasons for firing Long "were not its true reasons, but were a pretext for discrimination." *Wannamaker-Amos*, 126 F.4th at 255 (internal quotation marks omitted) (quoting *Burdine*, 450 U.S. at 253). Accordingly, the PSA is not entitled to summary judgment on the claim of disability discrimination.

**B. Retaliation**

Long also asserts a claim of retaliation in violation of the ADA. "The ADA's retaliation provision prohibits 'discriminat[ing] against any individual because such individual has' taken an action protected by the [ADA]." *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2026) (quoting 42 U.S.C. § 12203(a)). Long alleges that he was fired because he engaged in protected activity—namely, requesting an accommodation for his back injury.

The *McDonnell Douglas* burden-shifting framework also applies to ADA retaliation claims. *Jacobs*, 780 F.3d at 578. Under this method of proof, a plaintiff "must show (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action." *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate,

[2] Generally, when an employer receives notice of an employee's disability and desire for an accommodation, the employer has "a good-faith duty to engage [with the employee] in an interactive process to identify a reasonable accommodation." *Jacobs*, 780 F.3d at 581 (internal quotation marks omitted).

nonretaliatory reason for the adverse employment action. *Jacobs*, 780 F.3d at 578. If the employer does so, the burden then shifts back to the plaintiff to show that the proffered reasons are mere pretext for retaliation. *Id.*

Here, the PSA argues that Long's claim of retaliation "fails most clearly because he cannot establish that he engaged in a protected activity." (Def.'s Reply Br. at 7.) As the Fourth Circuit recently noted, however, the "act of requesting [an accommodation] is broadly protected under § 12203(a), which does not require the plaintiff to ultimately establish that the disability was cognizable under the ADA or that the request was reasonable, as long as the plaintiff made it in good faith." *Billesdon v. Wells Fargo Sec., LLC*, 188 F.4th 731, 747 n.17 (4th Cir. 2026). In other words, "any individual—even if he cannot ultimately prove that he satisfies the ADA's definition of disability—can request an accommodation and be protected from retaliation." *Id.* at 747.

Viewing the evidence in the light most favorable to Long, the court concludes that a reasonable jury could find that Long requested an accommodation after reinjuring his back at work. Long testified that he immediately disclosed the injury to Fasnacht, informed Fasnacht that he intended to seek treatment from Dr. Helms, and requested that Fasnacht "bear with [him]" while he obtained treatment. (Long Dep. at 40:21–23.) Additionally, Fasnacht testified that he and Long specifically discussed the possibility of "light duty" work after Long reported his back injury (Fasnacht Dep. at 12:11–14), and Nichols acknowledged that she would have engaged in an interactive process if she had known about their discussion (Nichols Dep. at 20:3–17). To request an accommodation, an employee is "not required to use magic words such as 'accommodation' and 'disability.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th

Cir. 2020). Instead, the employee must make clear that the employee wants assistance or needs an adjustment due to a medical condition, *Kelly v. Town of Abingdon*, 90 F.4th 158, 167 (4th Cir. 2024), or the "circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation," *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003). Based on the evidence presented, a reasonable jury could easily find that Long requested an accommodation for his back injury and therefore engaged in protected activity.

There is also sufficient evidence in the record from which a reasonable jury could find that a causal connection existed between Long's protected activity and his termination. As discussed above, Long was terminated less than a week after talking to Fasnacht about his back injury and a potential accommodation, and Linkous's own deposition testimony indicates that he was advised of their discussion. On this record, a reasonable jury could find that both Fasnacht *and* Linkous were aware of Long's request for an accommodation prior to firing him. And the close proximity between Long's termination and his accommodation request "is sufficient to establish a disputed issue of fact as to the causation element." *Jacobs*, 780 F.3d at 579 (finding the causation element met where the plaintiff was terminated three weeks after requesting an accommodation from her supervisor).

From there, the burden-shifting inquiry proceeds as it did with respect to Long's claim of disability discrimination. *See id.* For the same reasons set forth above, the court concludes that a reasonable jury could find that Long has offered sufficient evidence of pretext to prevail on his claim of retaliation. Consequently, the PSA is not entitled to summary judgment on the retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, the PSA's Motion for Summary judgment will be **DENIED**. The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 19th day of November, 2026.

HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE